UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAMON LANDOR

      PLAINTIFF

V.

J. HEPNER LIEUTENANT

    DEFENDANTS ET AL

  INDIVIDUAL CAPACITIES

NO 1:11-CV-759

JUDGE CALDWELL

MAGISTRATE JUDGE CARLSON

**FILED**
**SCRANTON**

AUG 2 4 2012

PER _____ M. & V

DEPUTY CLERK

MEMORANDUM OF LAW TO SUPPORT

MEMORANDUM IN OPPOSITION TO THE

MOTION

   COME NOW THE PLAINTIFF DAMON LANDOR, BY AND THROUGH PROCEEDING PRO'SE AND HEREBY RESPONDING TO DEFENDANT J HEPNER, BRIEF IN SUPPORT OF MOTION TO DISMISS AND / OR, IN THE ALTERNATIVE FOR SUMMARY JUDGEMENT.

  THE DISTRICT COURT SHOULD DISMISS "DEFENDANT J HEPNER", MOTION TO DISMISS FOR SUMMARY JUDGMENT IN IT ENTIRELY AND / OR GRANT LANDOR MEMORANDUM IN OPPOSITION TO THE MOTION IN LANDOR FAVOR BECAUSE: (1) DEFENDANT J HEPNER USE OF EXCESSIVE FORCE VIOLATED LANDOR RIGHTS AND CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION. (2) LANDOR HAS GENUINE ISSUES THAT EXISTS, AND LANDOR CASE NEED TO BE TRIED BEFORE A TRIAL. (3) DEFENDANT J HEPNER WAS PERSONALLY RESPONSIBLE FOR THE CLEARLY ESTABLISHED VIOLATIONS OF LANDOR RIGHTS. SEE., BELL ATLANTIC V. TWOMBLY, 550 U.S. 544, 555, 127 S. CT 1995 (2007) (STATING THAT THE DECISIONS ON SUCH MOTION TO DISMISS REST "ON THE ASSUMPTION THAT ALL THE ALLEGATIONS IN THE COMPLAINT ARE TRUE").

## I. PROCEDURAL HISTORY

REFERENCE ( DOC 29 AM COMPL )

LANDOR BIVENS COMPLAINT ALLEGED DEFENDANT HEPNER IS RESPONSIBLE FOR THE INFLICTION UNNECESSARY AND WANTON PAIN AND INHUMANE CONDITIONS, SEXUAL ASSAULT AND BATTERY VIOLATED LANDOR RIGHTS, AND CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION. IN CONNECTION WITH JULY 05 2010 THROUGH JULY 10 2010 USE OF EXCESSIVE FORCE PROCEDURE AT USP LEWISBURG AND THE UNLAWFUL USE OF HARD AMBULATOR RESTRAINTS.

REFERENCE ( DOC 72 )

ON JULY 05 2010 AT 10:00 AM [A FEDERAL HOLIDAY] DOG BLOCK "JOHN DOE," SERVED "LANDOR" A INADEQUATE LUNCH FOOD TRAY THAT CONTAINED SOY BEAN WITH OUT THE PEANUT BUTTER TO SUBSTITUTE SOY. "JOHN DOE", REFUSED TO CONTACT FOOD SERVICE FOR ABOUT THE MISSING PEANUT BUTTER ON THE LUNCH FOOD TRAY. "LANDOR" REQUESTED TO SPEAK WITH THE "SHIFT LIEUTENANT," ABOUT THE MISSING PEANUT BUTTER. "JOHN DOE," WALK AWAY FROM "LANDOR" CELL DOOR LEAVING CELL 201 FOOD SLOT UNSECURE. [EX ATTACHMENT RESPONSE FROM FOOD SERVICE ON JULY 05 2010 AT APPROXIMATELY 1:10 PM THE ACTIONS OF DEFENDANT HEPNER WERE NOT THE ACTIONS TO RESTORE OR MAINTAIN DISCIPLINE. THE PLAINTIFF "LANDOR," HAD COMPLIED WITH "DEFENDANT HEPNER'. ORDERS. "LANDOR" WAS NOT HOLDING THE FOOD SLOT. LANDOR SUBMITTED TO USE OF FORCE TEAM. HANDRESTRAINT. "DEFENDANT HEPNER" ORDERED LANDOR TO BE REMOVED FROM CELL 201 AND ESCORTED TO THE SECOND FLOOR SHOWER TO BE STRIPPED AND SEARCHED AND PLACED IN HARD AMBULATORY RESTRAINTS. CONSISTING OF : "3 SETS", (1) HANDRESTRAINTS (2) "WAIST CHAIN", (3) "LEG IRON", EACH AMBULATORY RESTRAINT WAS APPLIED UNNECESSARY TIGHTNESS AND PURPOSELY TO PUNISH. DEFENDANT HEPNER, ORDERER FOR LANDOR TO BE ESCORTED TO THE FIRST FLOOR AND PLACED INSIDE CELL 118. CELL 118 HAD ANOTHER PRISONER WASTE ON THE WALLS AND FLOOR, SINK. THERE WAS A STRONG SMELL OF URINE IN CELL 118, CELL 118 WAS INADEQUATELY VENTILATED. AT APPROXIMATELY 2:00 PM, ON JULY 05 2010, "DEFENDANT HEPNER", PERFORMED THE FIRST "TWO HOUR" LIEUTENANT RESTRAINT CHECK. DEFENDANT HEPNER, SEXUALLY ASSAULTED AND BATTERY LANDOR, "DEFENDANT HEPNER", THREATENED TO "FOUR POINT "LANDOR" ASS TO THE FLOOR. "DEFENDANT HEPNER", ALLEGED IF HE HEAR LANDOR COMPLAINING ABOUT PEANUT BUTTER AND SOY. DEFENDANT HEPNER TOLD "LANDOR" HE HAD FIVE DAYS TO GET HIS ACT TOGETHER

REFERENCE ( DOC 74 )

ON JUNE 6 2012 LANDOR AMENDED COMPLAINT STATED A EIGHTH AMENDMENT CLAIM.

REFERENCE (DOC 76)

THE DISTRICT COURT SHOULD DISMISS, DEFENDANT MOTION TO DISMISS FOR SUMMARY JUDGMENT AND STATEMENT OF MATERIAL FACTS MOTION IN IT'S ENTIRETY AND/OR, GRANT PLAINTIFF LANDOR MEMORANDUM IN OPPOSITION ON THE SOLID GROUNDS OF DEFENDANTS VIOLATED PLAINTIFF RIGHTS UNDER THE EIGHTH AMENDMENT.

## II. FACTUAL BACKGROUND

A. THE INCIDENT

REFERENCE (SMF 3-4,9)

ON JULY 05 2010 AT 10:00 AM, LANDOR WAS NOT DISRUPTIVE IN THE CELL AND LANDOR DID NOT STOP STAFF FROM SECURING THE FOOD SLOT. LANDOR INITIATED THE REQUEST OF SHIFT LIEUTENANT, CONCERNING THE FOOD TRAY THAT WAS MISSING THE PEANUT BUTTER SUBSITUTE IN THE PLACES OF THE SOY. A SUBSITUTE OF PEANUT BUTTER IS SUPPOSE TO BE SERVED WHEN EVER SOY IS SERVED ON THE FOOD TRAYS. SEE ATTACHMENT, DAMON LANDOR REG NUMBER: 28711-034 RESPONSE.

REFERENCE (5,16 SMF)

ON JULY 05 2010 AT 10:00 AM LANDOR ARM WAS NOT IN THE FOOD SLOT, NO STAFF CHARGED LANDOR FOR REFUSING STAFF ORDERS, NO STAFF CHARGED LANDOR FOR REFUSING TO REMOVE ARM FROM FOOD SLOT AND NO STAFF CHARGED LANDOR FOR THREATENED TO THROW FECES ON ANY STAFF WHO NEARED LANDOR CELL. NO "STAFF," ON JULY 05, 2010 AT 10:00 AM HAS SUBMITTED A AFFIDAVIT OR DECLARATION TO SUPPORT DEFENDANT HEPNER ALLEGATIONS. DEFENDANT HEPNER ALLEGATION IS NOT BASED ON PERSONAL KNOWLEDGE. SEE INCIDENT REPORT 2036697

SEE SAMUELS V. MOCKRY, 77 F3d 34, 36 (2d CIR 1996)

REFERENCE (SMF 6)

IT IS UNCLEAR THE EXACT TIME DEFENDANT J. HEPNER, NOTIFIED, DEFENDANT BRYAN BLEDSOE WARDEN OF THE ALLEGEDLY PROBLEM AT THE PRISON ON JULY 05 2010, A "FEDERAL HOLIDAY." DEFENDANT J. HEPNER "TIME", REPORT OF INCIDENT ARE INCONSISTENT. ON JULY 05 2010, DEFENDANT J. HEPNER, REPORTED A "TIME," OF INCIDENT "AT 10:00 A.M." , [EX. ATTACHMENT INCIDENT REPORT 2036697]. TWO HOURS LATER, ON JULY 05 2010 DEFENDANT J. HEPNER, REPORTED ANOTHER "TIME". OF INCIDENT "AT APPROXIMATELY 12:00 P.M." [EX. 1 ATTACHMENT 1 FORM 583 REPORT OF INCIDENT]. THE UNREPORTED TIME WAS ENOUGH TIME TO GATHER HEARSAY INFORMATION TO ORCHESTRATE AND IDEALIZE THE REQUIREMENT NEEDS TO NOTIFY DEFENDANT BRYAN BLEDSOE FOR THE ORDER OF AUTHORIZATION TO ASSEMBLE A USE OF FORCE TEAM IN ORDER TO PLACE LANDOR IN HARD AMBULATORY RESTRAINTS AND PROLONG LANDOR TIME IN AMBULATORY RESTRAINTS.

REFERENCE (SMF 7-10)

JULY 05 2010 AT APPROXIMATELY 1:10 P.M. DEFENDANT J. HEPNER, ASKED LANDOR TO PLACE HIS HANDS BEHIND HIS BACK AND THROUGH THE FOOD SLOT. LANDOR, COMPLIED WITH DEFENDANT J. HEPNER ORDER. AND SUBMITTED TO USE OF FORCE TEAM HANDRESTRAINTS. THE USE OF FORCE TEAM INFLICTED UNNECESSARY AND WANTON PAIN GRABBING LANDOR BY THE "NECK" AND FORCED LANDOR HEAD TOWARD THE FLOOR, LANDOR WAS IN A BENT OVER POSITION. (EXIST SEE) ESTELLE V GAMBLE 429 US 97 104 (1976), "ANTE, AT 319," . AFTER BEING REMOVED DURING THE UNNECESSARY PHYSICAL FORCED CELL EXTRACTION DEFENDANT J. HEPNER, ORDERED USE OF FORCE TEAM TO ESCORT LANDOR TO THE SECOND FLOOR SHOWER WHERE LANDOR WAS STRIPPED NAKE WHILE STILL IN A BENT OVER POSITION. THE USE OF FORCE TEAM SEARCHED LANDOR USED A BLACK DEVICE OR INSTRUMENT WITH A LIGHT ON THE DEVICE, THE USE OF FORCE TEAM USED THE LIGHT TO LOOK BETWEEN LANDOR BUTTOCKS DEFENDANT J. HEPNER ORDERED USE OF FORCE TEAM TO PLACE CLOTHING ONTO LANDOR. DEFENDANT J. HEPNER, ORDERED USE OF FORCE TEAM APPLY "HARD AMBULATORY RESTRAINTS" [NOT SOFT] AMBULATORY RESTRAINTS. [EX 1 ATTACHMENT 12 PROGRAM STATEMENT 5566.06] PAGE 8. DEAL WITH APPLYING SOFT RESTRAINTS. USE OF FORCE TEAM APPLIED EACH HARD AMBULATORY RESTRAINTS INTENTIONALLY, MALICIOUSLY AND SADISTICALLY FOR THE VERY PURPOSE OF CAUSING LANDOR HARM, LANDOR STILL HAVE THE SCARS TO SHOW ON HIS BODY HOW TIGHT THE HARD AMBULATORY RESTRAINT WERE APPLIED IN JULY 2010.

REFERENCE (SMF 8)

THE VIDEO TAPED USE OF FORCE PROCEDURE NEED TO BE CLOSELY MONITORED BY THE DISTRICT COURT TO DETERMINE THE CONSTITUTIONAL VIOLATIONS DURING THE VIDEO TAPED USE OF FORCE PROCEDURE. LANDOR PUNISHMENT IS IN MANIFESTS VIEW OF THE VIDEOTAPED RECORD CAMERA. LANDOR SUFFERED ULTIMATELY AS THE USE OF FORCE TEAM APPLIED HARD AMBULATORY RESTRAINTS CONSISTING OF: "HANDRESTRAINTS", "WAIST CHAIN" AND "LEG IRONS", DURING THE INFLICTED UNNECESSARY WANTON AND PAIN OF APPLIED RESTRAINTS. DEFENDANT HEPNER" PURPOSELY DEPRAVED LANDOR SITUATION IN RESTRAINTS. DEFENDANT HEPNER", DID NOT DEMONSTRATE A UP AND DOWN MOVEMENT ON EACH APPLIED RESTRAINTS IN VIEW OF THE VIDEOTAPED USE OF FORCE CAMERA TO SHOW RESTRAINTS ARE NOT BEING USED TO PUNISH LANDOR. ON JULY 05 2010 AT APPROXIMATELY 1:10 PM .

    SEE ... HUDSON V. MCMILLIAN, 503 U.S. 1, 6 112 S. CT 995, 998, 117 L. Ed. 2d 156, 165 (1992) ("[T]HE QUESTION WHETHER THE MEASURE TAKEN INFLICTED UNNECESSARY AND WANTON PAIN AND SUFFERING ULTIMATELY TURNS ON WHETHER FORCE WAS APPLIED IN A GOOD FAITH EFFORT TO MAINTAIN OR RESTORE DISCIPLINE OR MALICIOUSLY AND SADISTICALLY FOR THE VERY PURPOSE OF CAUSING HARM."

REFERENCE (SMF 9)

    ON JULY 05 2010 AT APPROXIMATELY 1:00 PM. "DEFENDANT HEPNER," STEREOTYPED LANDOR, BY USING LANDOR "DISCIPLINARY HISTORY", TO MAKE LANDOR LOOK LIKE A "KILLER", AND TO MOTIVE THE USE OF FORCE TEAM TO CHALLENGE LANDOR. BAD ACT;     LATAILLE V. PONTE, 754 F.2d 33-37 (1ST CIR 1985)

                  HARRIS V. DAVIS, 874 F.2d 461, 464 - 65 (7TH CIR 1989)

REFERENCE (SMF 12)

    ON JULY 05 2010 AT APPROXIMATELY 1:10 P.M UNTIL JULY 10 2010 AT APPROXIMATELY 6:30 PM. NO, LIEUTENANT OR LIEUTENANTS SEVERED LANDOR A WRITTEN NOTICE, CHARGING LANDOR WITH DISRUPTIVE BEHAVIOR OR AGITATED AND VERBALLY AGGRESSIVE BEHAVIOR. THE LIEUTENANT IS OBLIGATED TO REPORT ANY SIGNS OF DISRUPTIVE BEHAVIOR BY AN PRISONER AND ISSUE THE DISRUPTIVE PRISONER A INCIDENT REPORT FOR THE MISCONDUCT. THE LIEUTENANTS STATEMENTS AND REPORTS ARE IRRELEVANT AND CAN NOT SUPPORT DEFENDANT J HEPNER," DEFENSE WITH OUT NO EVIDENCE.

B. THE DISCIPLINARY ACTION

REFERENCE (SMF 13)

LANDOR DID NOT RAISES ANY ISSUES IN HIS COMPLAINT AGAINST THE CHARGES DEFENDANT J. HEPNER ALLEGED IN THE INCIDENT REPORT[#] 2036697 ON JULY 05 2010.

REFERENCE (SMF 14-15)

THE INFORMATION PROVIDED BY THE DEFENDANT'S IS NOT TRUE. THE DISCIPLINARY HEARING OFFICER ON SEPTEMBER 1, 2010, DID NOT EXPUNGED THE CODE 203 OFFENSE: THREATENING BODILY HARM FROM LANDOR. DISCIPLINARY HEARING ON SEPTEMBER 1, 2010. SEE (SMF 18-21)

REFERENCE (SMF 16)

LANDOR DID NOT CHALLENGE THE RULING OF THE DISCIPLINARY HEARING OFFICER. CONSIDERING DEFENDANT J. HEPNER ACCOUNT OF THE INCIDENT, IN HIS COMPLAINT.

REFERENCE (SMF 17)

LANDOR DID NOT CHALLENGE THE DISCIPLINARY HEARING OFFICER CONSIDERED DEFENDANT J. HEPNER WRITTEN MEMORANDUM ON JULY 05 2010.

REFERENCE (SMF 18-21)

LANDOR DID NOT CHALLENGE NONE OF THE ISSUES RAISED BY THE DISCIPLINARY HEARING OFFICER IN HIS COMPLAINT. LANDOR DID NOT APPEAL THE DISCIPLINARY HEARING OFFICER DECISION. LANDOR EXHAUSTED ADMINISTRATIVE REMEDIES AGAINST DEFENDENT J HEPNER VIOLATING LANDOR EIGHTH AMENDMENT RIGHTS.

REFERENCE (SMF 22-25)

THE PUNISHMENT LANDOR EXPERIENCED ON JULY 05 2010 UNTIL JULY 10 2010 EXISTS WHOLLY OUTSIDE OF THE FEDERAL BUREAU OF PRISONS DISCIPLINARY SYSTEM.

C. PROCEDURES REGARDING USE OF AMBULATORY RESTRAINTS

REFERENCE (SMF 26)

[ EX 1  ATTACH 12  PROGRAMSTATEMENT 5566.06 ]

1. [ PURPOSE AND SCOPE 552.20. THE BUREAU OF PRISONS AUTHORIZES STAFF TO USE FORCE ONLY AS A LAST ALTERNATIVE AFTER ALL OTHER REASONABLE EFFORTS TO RESOLVE A SITUATION HAVE FAILED. WHEN AUTHORIZED, STAFF MUST USE ONLY THAT AMOUNT OF FORCE NECESSARY TO GAIN CONTROL OF THE INMATE, TO PROTECT AND ENSURE THE SAFETY OF INMATES, STAFF AND OTHER, TO PREVENT SERIOUS PROPERTY DAMAGE, AND TO ENSURE INSTITUTION SECURITY AND GOOD ORDER. STAFF ARE AUTHORIZED TO APPLY PHYSICAL RESTRAINTS NECESSARY TO GAIN CONTROL OF AN INMATE WHO APPEARS TO BE DANGEROUS BECAUSE THE INMATE : IN LANDOR CASE, DEFENDANT J. HEPNER FAILED TO RESOLVE LANDOR SITUATION. NO EFFORT WAS MADE ABOUT THE MISSING PEANUT BUTTER LANDOR WAS SUPPOSE TO RECEIVE ON JULY 05 2010.

REFERENCE (SMF 30)

THE BOP POLICY DIRECTS ON PAGE 7 OF THE PROGRAMSTATE 5566.06. [ H. RESTRAINT EQUIPMENT OR DEVICES (E.G., HANDCUFFS) MAY NOT BE USED IN ANY OF THE FOLLOWING WAYS:
(1) AS A METHOD OF PUNISHING AN INMATE;
(2) ABOUT AN INMATE'S NECK OR FACE, OR IN ANY MANNER WHICH RESTRICTS BLOOD CIRCULATION OR OBSTRUCTS THE INMATE'S AIRWAYS: ]
[ (3) IN A MANNER THAT CAUSES UNNECESSARY PHYSICAL PAIN OR EXTREME DISCOMFORT. ]

REFERENCE (SMF 10-11)

ON JULY 05 2010, DEFENDANT J. HEPNER, USE OF EXCESSIVE FORCE VIOLATED LANDOR RIGHT AND CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT UNDER EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION. "DEFENDANT J. HEPNER," INITIATED THE INFLICTION OF UNNECESSARY EXCESSIVE FORCE. THE USE OF FORCE TEAM APPLIED EACH HARD AMBULATORY RESTRAINTS CONSISTING OF, "HANDRESTRAINTS" "WAISTCHAIN" AND "LEGIRONS",, MALICIOUSLY AND SADISTICALLY INTENTIONALLY CAUSING HARM TO LANDOR. DEFENDANT J. HEPNER, DENIED LANDOR HUMANE CONDITIONS OF CONFINEMENT IN DOG BLOCK CELL 118. DEFENDANT J. HEPNER," SEXUALLY ASSAULTED AND BATTERY LANDOR. DEFENDANT J HEPNER IMPOSED A SANCTION ON LANDOR TO SERVE (5) DAYS IN RESTRAINTS.

REFERENCE (SMF 12)

LET THE RECORDS REFLECT THAT NO LIEUTENANTS OR MEDICAL STAFF MEMBERS CHARGED LANDOR WITH DISPLAY DISRUPTIVE, AGITATED OR VERBALLY AGGRESSIVE BEHAVIOR, LANDOR NEVER RECEIVED A WRITTEN NOTICE OF MISCONDUCT DURING THE (5) DAYS IN HARD AMBULATORY RESTRAINTS.

REFERENCE (SMF 33-42)

LANDOR DO NOT DISPUTE BOP POLICY, ONLY THE STAFF MEMBERS THAT "CONDUCTED THE CHECKS."

REFERENCE (SMF 44-62)

THE LIEUTENANTS THAT PERFORMED RESTRAINTS CHECKS REFUSED TO LOOSEN RESTRAINTS AFTER CONTINUOUS COMPLAINTS OF UNNECESSARY TIGHTNESS, ALONG WITH CLEARLY VISIBLE SIGNS OF SWOLLEN LIMBS AND LACERATED INJURIES CAUSED BY THE TIGHTNESS OF RESTRAINTS, MEDICAL STAFF WOULD NOT DOCUMENT THE FORESEEABLE INJURIES AS MEDICAL DID THEIR CHECKS. USP LEWISBURG DID NOT COMPLY WITH POLICY.

REFERENCE (SMF 49-56)

ON JULY 05 2010 AT APPROXIMATELY 1:10 P.M. THE USE OF FORCE TEAM APPLIED EACH ONE OF LANDOR HARD AMBULATORY RESTRAINTS INFLICTED UNNECESSARY AND WANTON PAIN. LANDOR, SUFFERED ULTIMATELY. THE PAINFUL RESTRAINTS CAUSED LANDOR INTENSE PAIN, SWELLING AND NERVE DAMAGE, WHICH MADE IT EXTREMELY DIFFICULT FOR LANDOR TO EAT, BREATHE, SLEEP AND WALK. LANDOR WAS FORCED TO EXCRETE HIS ON WASTE ON HIMSELF DURING THE (5) DAYS IN RESTRAINTS. LANDOR WRISTS ARE STILL SCARRED FROM JULY 05 2010 RESTRAINTS. DEFENDANT HEPNER", KNEED LANDOR IN THE GROIN AND GRABBED LANDOR'TESTICLES AND CAUSED LANDOR INJURIES.

EX ATTACH   PHYSICAL PROFILE SHEET

SEE. ROBIN V MEECHAM 60 F3d 1436.1439 (9TH CIR 1995)

D. DEFENDANT HEPNER

REFERENCE (SMF 43)

LANDOR WAS NOT COMMITTING ANY PROHIBITED ACTS WHEN "DEFENDANT HEPNER", KNEED LANDOR IN THE GROIN, AND GRABBED LANDOR TESTICLES, AND THREATENED TO FOUR POINT OR EAGLE SPREAD LANDOR TO THE FLOOR. DURING THE VERY FIRST "MINUTES", OF THE LIEUTENANT RESTRAINTS CHECKS.

REFERENCE (SMF 43)

(YES) LANDOR WAS GOING THROUGH SOME UNUSUAL MALE PROBLEMS.

REFERENCE (SMF 58-61)

LANDOR SUBMITTED A DECLARATION IN WHICH LANDOR ALLEGED ON JULY 05 2010, DEFENDANT HEPNER KNEED LANDOR IN THE GROIN, GRABBED LANDOR TESTICLES, AND THREATENED LANDOR, IN THE OR WITH THE COMPLAINT.

REFERENCE (SMF 58-60)

ON JULY 05 2010, AT APPROXIMATELY 1:10 P.M. "DEFENDANT HEPNER," HAD LANDOR REMOVED FROM CELL 201 PLACED IN HARD AMBULATORY RESTRAINTS AND ESCORTED TO CELL 118 AND PLACED INSIDE OF CELL 118. [NOT EVEN FIFTY MINUTES LATER]. ON JULY 05 2010 AT APPROXIMATELY 2:00 P.M. "DEFENDANT HEPNER" SHOW UP TO PERFORM THE VERY FIRST OF THE "TWO HOUR", LIEUTENANT RESTRAINT CHECK. THE NEXT LIEUTENANT RESTRAINT CHECKS WAS SUPPOSE TO BE AT 3:00 PM. SEE TIMES OF INCIDENT ON REPORTS".

[FACT: BOP POLICY PROGRAM STATEMENT 5566.06 ON PAGE 7]

"IF THE INMATE WAS PLACE IN RESTRAINTS BECAUSE OF AN ASSAULT ON STAFF, THE ASSAULTED EMPLOYEE [MUST NOT] BE INVOLVED IN DECIDING WHETHER THE INMATE HAS REGAINED SELF CONTROL".

[ON JULY 05 2010 AT 10:00 AM "DEFENDANT HEPNER", ISSUED INCIDENT REPORT # 2036697 CHARGING LANDOR WITH THE OFFENSE CODE: 203 THREATENING BODILY HARM.]

"DISPUTE", "DEFENDANT HEPNER", INTENTIONALLY KNEED LANDOR IN THE GROIN AND GRABBED LANDOR TESTICLES. "DISPUTE", "DEFENDANT HEPNER," WAS NOT SUPPORT TO BE INVOLVED IN DECIDING WHETHER "LANDOR", HAD REGAINED SELF CONTROL ON JULY 05 2010 AT APPROXIMATELY 2:00 PM.

REFERENCE (SMF 63 67)

LANDOR DO NOT DISPUTE.

REFERENCE (SMF 67)

LANDOR, DO NOT DISPUTE.

REFERENCE (SMF 45)

LANDOR ONLY RECALL THE LIEUTENANTS AND MEDICAL STAFF DURING JULY 05 2010 AND JULY 16, 2010. LANDOR DO NOT RECALL SEEING ANY OTHER STAFF.

REFERENCE (SMF 43-53 70 84)

ON JULY 05 2010  LANDOR SUSTAINED AN INJURY TO THE GROIN OR TESTICLES, LANDOR SUFFERED
IN PAIN. LANDOR CAN "ONLY". INFORM MEDICAL STAFF MEMBERS OF HIS MEDICAL NEEDS. LANDOR
CAN NOT FORCE MEDICAL STAFF MEMBERS TO CARRY OUT THEIR OBLIGATED PREEXISTING DUTIES.

REFERENCE (SMF 71)

UNITED STATES PENITENTIARY LEWISBURG, "HEALTH DEPARTMENT," STAFF MEMBERS ARE VERY
UNPROFESSIONAL ABOUT INMATES MEDICAL CONDITIONS. LANDOR COMPLAINED ABOUT HIS
INJURY AND SHOWED HIS INJURY TO PA NAVARO, LONG BEFORE SEPTEMBER 27 2010.

REFERENCE (SMF 72)

LANDOR EXPLAINED. THE SAME EXACT INFORMATION THAT LANDOR PREVIOUSLY PROVIDED TO PA NAVARO
AND TO FERDINAND N. ALAMA MLP.

REFERENCE (SMF 73)

ON SEPTEMBER 28 2010 LANDOR STATED "I HAVE BEEN COMPLAINING ON SUFFERING WITH MY
MEDICAL PROBLEMS."

REFERENCE (SMF 74)

TURE (3 MONTHS LATER) 9/30/10

REFERENCE (SMF 75)

LANDOR INFORMED PA ALAMA THAT THE PAIN OCCUR DURING EXERCISENG AND USING THE
BATHROOM.

REFERENCE (SMF 76)

ON OCTOBER 21, 2010 LANDOR HAD THE RIGHT TO ASK MEDICAL STAFF MEMBER, WHAT TYPE OF BLOOD TEST IS BEING CONDUCTED. THE MEDICAL STAFF MEMBER REFUSED TO INFORM LANDOR ON THE REQUESTED INFORMATION. LANDOR REFUSED TO UNDERGO BLOOD WORK.

REFERENCE (SMF 77)

ON JANUARY 19, 2011, "MORE THAN SIX MONTHS" AFTER THE JULY 05 2010 INCIDENT, LANDOR HAD SUFFERED IN PAIN, COMPLAIN AFTER COMPLAIN BEFORE BEING SEEN BY USP LEWISBURG CLINICAL DIRECTOR, KEVIN PIGOS, M.D. [ SO TOTALLY UNPROFESSIONAL OF CLINICAL DIRECTOR KEVIN PIGOS MD ]

REFERENCE (SMF 78-80)

        "TURE",

REFERENCE (SMF 80)

        LANDOR RECALL THE INFORMATION.

REFERENCE (SMF 81)

        LANDOR RECALL THE TEST.

REFERENCE (SMF 84)

        LANDOR DO NOT RECALL REFUSING A BLOODWORK APRIL 04 2011

REFERENCE (SMF 68)

THEIR WERE NO BOP OFFICIAL THAT HAD PROPERLY ADDRESSED CONCERNS OF LANDOR BEING THE VICTIM OF A SEXUAL ASSAULT AND BATTERY BY DEFENDANT HEPNER ON JULY 05 2010. LANDOR WOULD LIKE TO KNOW WHO WAS THE INVESTIGATING OFFICIAL.

REFERENCE (SMF 69)

LANDOR WAS UNAWARE OF THE INVESTIGATION. HOW LONG DID THE INVESTIGATION LASTED.

REFERENCE (DOC 74 AT 4)

ON JULY 05 2010 DEFENDANT HEPNER PLACED LANDOR INTO CELL 118. THERE WAS HUMAN WASTE ALL OVER THE CELL. ( MCBRIDE V. DEER  240 F. 3d 1287  (10TH CIR 2001)

REFERENCE (SMF 94-95)

DO T. WAGNER, " THE CAMERA OPERATOR WHO VIDEOTAPE THE EXCESSIVE PHYSICAL FORCED CELL EXTRACTION, HAVE ANY PHOTOS OF THE INSIDE OF CELL 118 ON JULY 05 2010. LANDOR WOULD LIKE FOR THE COURT TO SEE THE PHOTOS OF CELL 118 ON JULY 05 2010.

REFERENCE (SMF 96)

LANDOR STATED HUMAN WASTE WAS ON THE WALLS AND FLOOR. ON THE SINK, LANDOR DID NOT STATED A BROWN SPOT.

REFERENCE (SMF 97)

LANDOR WAS PLACED IN CELL 118 ON JULY 05 2010, NOT NOVEMBEM 8, 2011, T. WAGNER PHOTOGRAPHS OF CELL 118 IS IRRELEVANT.

E. AFFIDAVIT OF INMATE DYE

REFERENCE (DOC 29 AT 9)

LANDOR SUBMITTED A COPY OF MUHAMMAD DYE AFFIDAVIT ALONG WITH LANDOR FIRST AMENDED COMPLAINT. LANDOR WAS UNAWARE OF THE ERROR ON THE AFFIDAVIT.

REFERENCE (SMF 86)

LANDOR DID NOT NOTICE THE ERROR MUHAMMAD DYE MADE ON THE AFFIDAVIT ON THE DATE AND TIME OF INCIDENT. LANDOR WAS RUSHING TO MAIL OUT THE AMENDED COMPLAINT. LANDOR DID NOT LOOK OVER MUHAMMAD DYE AFFIDAVIT.

THOMAS V. ROACH 165 F.3d 137, 144 (2d CIR 1999)

REFERENCE (SMF 87-90)

LANDOR IS TRYING TO CONTACT MUHAMMAD DYE TO AMEND THE AFFIDAVIT TO SUPPORT LANDOR ALLEGATIONS. THE FACTS REMAIN LANDOR AND DYE WERE NOT SUPPOSE TO BE IN THE SAME CELL IN HARD AMBULATORY RESTRAINT TOGETHER. PRISONER LANDOR AND DYE BOTH SUFFER A MEDICAL CONDITION OF SEIZURE DISORDER. BOTH PRISONERS ARE ASSIGNED LOWER BUNK BEDS. DEFENDANT HEPNER SHOULD HAVE NEVER PLACED MUHAMMAD DYE IN CELL 118. BOTH PRISONERS NEVER RECEIVED THEIR MEDICATION THAT HAD BEEN PRESCRIBED TO THEM.

REFERENCE (SMF 91-92)

LANDOR DO NOT RECALL DEFENDANT HEPNER STATEMENT.

LEGAL STANDARDS

A. LANDOR RESPOND TO DISMISSAL FAILURE TO STATE A CLAIM

UNDER FEDERAL RULE CIVIL PROCEDURE 12(B)(6) A DISTRICT COURT SHOULD NOT DISMISS A COMPLAINT THAT INCLUDE ENOUGH FACTUAL MATTER TO MAKE THE CLAIMS "PLAUSIBLE". LANDOR HAS PROVIDED THE GROUND'S OF HIS ENTITLE[MENT] TO RELIEF. PLAINTIFF LANDOR FACTUAL ALLEGATIONS SUPPORT THE ELEMENTS IN THE COMPLAINT AND THE FACTUAL ALLEGATIONS SUPPORTED A VALID CLAIM. SEE RIDGE AT RED LAWK L.L.C. V. SCHNEIDER 493 F.3d 1174, 1177 (10TH CIR 2007) PHILLIPS V. CIRDICH, 408 F.3d 124, 130 (2d CIR 2005); O'GRADY V. VILLAGE OF LIBERTYVILLE, 304 F.3d 719, 723 (7TH CIR 2002).

PLAINTIFF LANDOR PLEADED FACTS TO THE BEST OF HIS KNOWLEDGE STATING A CLAIM. PLAINTIFF LANDOR EXPLAINED IN THE COMPLAINT. HIS CONSTITUTIONAL RIGHTS WERE VIOLATED AND THE RIGHT THAT WAS VIOLATED WAS "CLEARLY ESTABLISHED" AND DEFENDANT HEPNER WAS PERSONALLY RESPONSIBLE FOR THE VIOLATION OF LANDOR EIGHTH AMENDMENT RIGHT. SEE PHILLIPS V. COUNTY OF ALLEGHENY, 515 F.3d 224, 234 (3d CIR 2008) ( BILLMAN V. INDIANA DEP'T OF CORR. 56 F.3d 785, 789-90 (7TH CIR 1995) (POSNER, C.J.) (THE PECULIAR PERVERSITY OF IMPOSING HEIGHTENED PLEADING STANDARDS IN PRISONER CASES... IS THAT IT IS FAR MORE DIFFICULT FOR A PRISONER TO WRITE A DETAILED COMPLAINT THAN FOR A FREE PERSON TO DO SO. AND AGAIN THIS IS NOT BECAUSE THE PRISONER DOES NOT KNOW LAW BUT BECAUSE HE IS NOT ABLE TO INVESTIGATE BEFORE FILING SUIT.") ACCORD RODRIGUEZ V. PLYMOUTH AMBULANCE SERVICE 577 F.3d 816, 821 (7TH CIR 2009) ALSTON V. PARKER. 363 F.3d 229, 223 N.6 (3d CIR 2004).

LANDOR ASK THE DISTRICT COURT TO REJECT THE DEFENDANT F.R.C.P 12(B)(6) AND HOLD LANDOR PRO'SE COMPLAINT TO LESS STRINGENT STANDARDS THAN FORMAL PLEADINGS DRAFTED BY LAWYERS, AND HAVE ACKNOWLEDGE THE SPECIAL PROBLEMS IN WRITING DETAILED COMPLAINTS THAT ARE CAUSED BY INCARCERATION.

## B. PLAINTIFF LANDOR RESPOND SUMMARY JUDGMENT

THE DEFENDANT SHOULD NOT BE ABLE TO GET SUMMARY JUDGMENT BASED ON A LAWYER'S AFFIDAVIT. THE INFORMATION BY THE DEFENDANT ON THE SUMMARY JUDGMENT (SEE (SMF 16) PAGE 4, IS THE DEFENDANT STATEMENT ON JULY 05 2010, WHICH IS BASED ON CONCLUSORY ALLEGATIONS "NOT" BASED ON PERSONAL KNOWLEDGE OF THE INCIDENT. THE DEFENDANT IS CLEARLY STATENG HEAR SAY, AND IF YOU READ THE SUMMARY JUDGMENT SEE (SMF 17) PAGE 5 THE DEFENDANT HAS ALLEGED TWO DIFFERENT TIMES ON THE SAME INCIDENT. ( WEBER V. DELL 804 F2d 796 802 (2d CIR 1986) ( SHERIFF'S ASSERTION THAT 70% OF ARRESTEE CARRY CONTRABAND IN JAIL, "A CONCLUSORY ESTIMATE BASED NEITHER ON PERSONAL OBSERVATION( NOR ON AN ANALYSIS OF THE JAILS RECORDS", WAS AN IMPROPER BASIS FOR SUMMARY JUDGMENT) .ALSO LANDOR IS TRYING SECURE A AFFIDAVIT FROM MUHAMMAD DYE TO SUPPORT LANDOR CLAIM OF CONDITION OF CONFINEMENT, LANDOR HAS ASK THE LEGAL DEPARTMEN SEE MEMORANDUM ATTACH.
SEE BATT V. TWOMEY 513 F.2d 641 650 (7TH CIR 1975)

LANDOR ASK THE COURT TO DENY DEFENDANT SUMMARY JUDGMENT. THE DEFENDANT HAVE NOT SUBMITTED AN ADEQUATE FACTUAL CASE.

## A.

LANDOR REFUTES THE ARGUMENT OF THE FAVORABLE TERMINATION RULE LANDOR SITUATION SHOULD NOT BE DETERMINE BY THE DECISION BASED IN HECK V. HUMPHREY, OR EDWARD V. BALISOK. LANDOR RAISED EIGHTH AMENDMENT VIOLATIONS. THE FACTS IN HECK V. HUMPHREY DEAL WITH THE HEBEAS CORPUS. THESE ARE DISTINGUISHING CASES.

B. LANDOR RESPOND TO EIGHTH AMENDMENT CLAIM AGAINST DEFENDANT HEPNER

THE RULES THAT APPLY IN AN PLAINTIFF LANDOR EIGHTH AMENDMENT COMPLAINT HAVE STATED WHERE DEFENDANT HEPNER IS RESPONSIBLE FOR UNNECESSARY AND WANTON INFLICTION OF PAIN, THE EIGTH AMENDMENT HAS BEEN VIOLATED THE ACTIONS OF DEFENDANT HEPNER WERE NOT ACTIONS TO RESTORE OR MAINTAIN DISCIPLINE. THE PLAINTIFF LANDOR WAS ALREADY IN SHACKLES AND CHAIN / HANDS WAIST CHAIN AND LEG IRONS DUE TO THE ALLEGED PROHIBITED ACT ON JULY 05 2010 AT 10:00 AM. [NO] FURTHER PROHIBITED ACT WAS COMMITTED BY PLAINTIFF LANDOR ON JULY 05 2010 ALLEGED BY DEFENDANT HEPNER FOR HIS ACTIONS, WHICH WERE THE ACTIONS OF MALICIOU AND SADISTICALLY TO CAUSE THE PLAINTIFF FURTHER HARM AND INJURY TO PLAINTIFF GENITALS.

EXCESSIVE FORCE IS ANY PHYSICAL CONTACT BY A GUARD THAT IS MEANT TO CAUSE HARM, RATHER THAN KEEP ORDER. WHEN DEFENDANT HEPNER CAME TO THE CELL 118, DOG BLOCK, ON JULY 05 2010, AT 2:00 PM. PLAINTIFF LANDOR WAS NOT COMMITTING ANY PROHIBITED ACT IN CELL 118. DEFENDANT HEPNER, WAS NOT SUPPOSE TO BE IN THE CELL WITH LANDOR. ACCORDANCING WITH BOP POLICY 5566.06 PAGE 7. DEFENDANT HEPNER ACCUSED LANDOR OF THREATENING BODILY HARM. DEFENDANT HEPNER WAS NOT TO BE INVOLVED WITH INMATE REGAINING SELF CONTROL. DEFENDANT HEPNER, KNEED LANDOR IN THE GROIN, GRABBED LANDOR TESTICLES, AND THREATENED TO PLACE LANDOR IN FOUR POINT RESTRAINTS.

DEFENDANT HEPNER STATE OF MAN WAS CULPABLE AND HIS ACTION WERE THE RESOLUTE OF THAT STATE OF MAN,

LANDOR EIGHTH AMENDMENT CLAIMS AGAINST DEFENDANT HEPNER WAS ADDRESS IN LANDOR COMPLAINT.

## C. DEFENDANT HEPNER IS NOT ENTITLED TO QUALIFIED IMMUNITY

DEFENDANT HEPNER ACTED ILLEGALLY WHEN MADE PHYSICAL CONTACT BY KNEED LANDOR IN THE GROIN AND GRABBED LANDOR TESTICLES. ALSO THE UNLAWFUL EXCESSIVE USE OF FORCE. LANDOR CONSTITUTIONAL RIGHTS WERE VIOLATED LANDOR RIGHT THAT WAS VIOLATED WAS CLEARLY ESTABLISHED. AND DEFENDANT HEPNER WAS PERSONALLY RESPONSIBLE FOR THE VIOLATIONS OF LANDOR RIGHTS AND DEFENDANT HEPNER SHOULD BE DENIED QUALIFIED IMMUNITY DUE TO CONSTITUTIONAL VIOLATION. SEE SAUCIER V. KATZ 533 U.S. 194 (2001) AND HARLOW V. FITZGERALD 457 U.S. 800 (1982).

THE INFORMATION IN THE CASE AGAINST DEFENDANT HEPNER REFUTES DEFENDANT HEPNER HEARSAY ALLEGATIONS. DEFENDANT HEPNER ACTED UNLAWFULLY AND JUSTICE NEED TO BE SERVE FOR HIS CONDUCT.

THEREFORE, THE DISTRICT COURT SHOULD DISMISS THE MOTION TO DISMISS FOR SUMMARY JUDGMENT AND GRANT MEMORANDUM IN OPPOSITION TO THE MOTION

## CONCLUSION

LANDOR PRAYS THE COURT GRANT THE ORDER,

RESPECTFULLY SUBMITTED

DAMON LANDOR
USP LEWISBURG
PO BOX 1000
LEWISBURG PA 17837
DATED AUGUST 19, 2012



UNITED STATES GOVERNMENT
# MEMORANDUM
*United States Penitentiary*
*Lewisburg, Pennsylvania 17837*

August 10, 2012

## MEMORANDUM FOR DAMON LANDOR, REGISTER NUMBER 28711-034

FROM:  D. Weber, Paralegal

SUBJECT:   Legal Correspondence

This is in response to your cop-out received by this office.   Please be advised Legal
staff do not provide legal assistance to the inmate population.

I trust this has been responsive to your request.

Medical Unit

Physical Profile

Name __DAMON LANDOR__

Date of Birth __MARCH 11 1979__

BOP #
CODE __28711 - 034__

Date __JULY 05 2010 UNTIL JULY 10 2010__



CHEST PAIN

SWOLLEN ARMS

RIGHT WRIST
NERVE DAMAGE

RIGHT HAND NERVE
DAMAGE

RIGHT LEG SWOLLEN

RIGHT ANKLE NERVE
DAMAGE

NECK PAIN

BACK PAIN

SWOLLEN
WRISTS

GROIN AND TESTICLES

LEFT LEG SWOLLEN

LEFT ANKLE

GOVERNMENT
EXHIBIT

Ex. 1. Attach. 1

# Form 583 Report of Incident

**Incident #:** LEW-10-0511   **Submitted By:** B. A. Bledsoe, Warden   **Date/Time Of Incident:** 7/5/2010 12:30 PM

## Section 1: General Information

**FBI Notified:** No   **USMS Notified:** No   **Incident Location:** Housing Unit, Secured

**Indicate Where Incident Occurred:** Main Facility

**Type Of Incident**

- ☐ Assault On Inmate
- ☐ Assault On Staff
- ☐ Assault, Attempted On Inmate
- ☐ Assault, Attempted On Staff
- ☑ Disruptive Behavior
- ☐ Escape From Non-secure Facility
- ☐ Escape From Secure Facility
- ☐ Escape, Attempted From Non-secure Facility
- ☐ Escape, Attempted From Secure Facility
- ☐ Fight
- ☐ Inmate Death
- ☐ Institution Disturbance
- ☐ Introduction Of Contraband
- ☐ Lethal Weapons Discharge
- ☐ Self Mutilation
- ☐ Setting A Fire
- ☐ Sexual Act, Non-consensual On Inmate
- ☐ Sexual Assault On Staff
- ☐ Sexual Contact, Abusive On Inmate
- ☐ Staff Homicide
- ☐ Strike, Food
- ☐ Strike, Work
- ☐ Suicide Attempt
- ☑ Use Of Force/Applications Of Restraints
- ☐ Use Of Restraints, Pregnant Inmate

**Institution Locked Down:** No

**Cause Of Incident Known?** No

**Cause Of Incident**

- ☐ Alcohol
- ☐ Commissary
- ☐ Debts
- ☐ Disrespect Issue
- ☐ Drugs
- ☐ Ethnic Conflict
- ☐ Food Issue
- ☐ Geographical Conflict
- ☐ Interfering with Staff duties
- ☐ Property Issue
- ☐ Racial Conflict
- ☐ Recreation Equipment
- ☐ Religious Issue
- ☐ Security Threat Group Conflict
- ☐ Sexual Pressure
- ☐ Sporting Events
- ☐ Telephone
- ☐ Theft
- ☐ Visiting
- ☐ Work Issue

## Section 2: Inmates Involved

**Reg #:** 28711034   **Name:** LANDOR, DAMON

**Role:** Suspect   **Medical Attention Required:** No

**Weapon (per inmate):** No   **Use of Force (per inmate):** Yes   **Chemical Used (per inmate):** No

**CIMS:** Yes   **STG:** Yes

**Restraints (per inmate):** Prolonged

    **Restraints Authorized By:** Bledsoe, B. A.

    **Date/Time Placed In Restraints:** 7/5/2010 1:10 PM

    **Restraint Equipment Used:** ☑ Hard   ☐ Soft

000006

# Form 583 Report of Incident

Incident #: LEW-10-0511          Submitted By: B. A. Bledsoe, Warden          Date/Time Of Incident:  7/5/2010 12:30 PM

No data found.

## Section 6: Description of Incident

**DESCRIPTION OF INCIDENT (If Use Of Force, include details such as name of supervisor applying the chemical agent and/or restraints, reasons for use of hard restraints instead of soft restraints, etc.) Please be clear about cause(s) of the incident in your description.**

On July 5, 2010, at approximately 12:30 p.m.,  inmate Damon Landor #28711-034, became disruptive while in his cell in D-Block.  Specifically, inmate Landor refused to remove his arm from the food slot and allow staff to secure it.  Inmate Landor was given several orders by staff to remove his arm from the food slot with negative results.  Inmate Landor displayed signs of imminent violence by stating he would assault any Officer that came near his cell.   Due to inmate Landor's refusal of staff's orders, as well as his display of imminent violence, the Warden was notified and authorized a Use of Force Team to be assembled to place inmate Landor into ambulatory restraints.  At approximately 1:00 p.m., a Use of Force Team was assembled and confrontation avoidance procedures were initiated with positive results.  Inmate Landor was removed from cell #201 and escorted to the second floor shower.  Inmate Landor was visually searched, placed in new clothes, and placed into ambulatory restraints at approximately 1:10 p.m.  He was escorted to cell #118 and placed inside without further incident.  Inmate Landor sustained no injuries.  No staff injuries were reported.

## Section 7: Attachments

| File Date | File Name | Original Entered By | Original Loc. Code |
|---|---|---|---|
| 7/5/2010 | Inj Ass landor.pdf | TF18255 | LEW |
| 7/5/2010 | IR landor.pdf | TF18255 | LEW |
| 7/5/2010 | memos.pdf | TF18255 | LEW |
| 7/5/2010 | roster.pdf | TF18255 | LEW |

Approved By:  SUBMITTED
B. A. Bledsoe, Warden

**000008**



U. S. Department of Justice
Federal Bureau of Prisons

GOVERNMENT
EXHIBIT
Ex. 1. Attach. 12

# Program Statement

| | |
|---|---|
| **OPI:** | CPD/CSB |
| **NUMBER:** | P5566.06 |
| **DATE:** | 11/30/2005 |
| **SUBJECT:** | Use of Force and Application of Restraints |

1.  [<u>PURPOSE AND SCOPE</u> §552.20.  The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed.  When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, to prevent serious property damage, and to ensure institution security and good order.  Staff are authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate:

   a.  Assaults another individual;
   b.  Destroys government property;
   c.  Attempts suicide;
   d.  Inflicts injury upon self; or
   e.  Becomes violent or displays signs of imminent violence.

This rule on application of restraints does not restrict the use of restraints in situations requiring precautionary restraints, particularly in the movement or transfer of inmates (e.g., the use of handcuffs in moving inmates to and from a cell in detention, escorting an inmate to a Special Housing Unit pending investigation, etc.).]

Under this rule precautionary restraints may also be used as prescribed by medical staff for medical purposes in accordance with procedures set forth in the Health Services Manual.

The use of restraints on inmates due to mental illness (e.g., to prevent suicide or infliction of self-injury) is subject to this Program Statement's provisions and the Program Statement on

[Bracketed Bold - Rules]
Regular Type - Implementing Information

P5566.06
11/30/2005
Page 2

Suicide Prevention Program.  This includes the placement,
reviews, and release of inmates from restraints at all Bureau
facilities, including medical referral centers.

This policy's purpose is not to discourage employees from using
the amount of force necessary to protect themselves from assault,
bodily harm, and/or loss of life.  This policy will provide
guidance and instruction on appropriate procedures when
confronted with situations that may require the use of force to
gain control of an inmate.

An employee may not use brutality, physical violence, or
intimidation toward inmates, or use any force beyond that which
is reasonably necessary to subdue an inmate.

2.  **PROGRAM OBJECTIVES.**  The expected results of this program
are:

   a.  Force will ordinarily be used only when attempts to gain
voluntary cooperation from the inmate have not been successful.

   b.  When force is used, it will be only the amount of force
required to subdue an inmate, or preserve or restore institution
security and good order.

   c.  Confrontation avoidance techniques will be used when
feasible to avoid calculated use of force situations.

   d.  When an inmate must be subdued, the use-of-force team
technique will be used when feasible.

   e.  Any inmate restrained to a bed will be checked every 15
minutes.

   f.  Chemical agents will be used as specified and, to the
extent practicable, only after a review of the inmate's medical
file, unless such a delay would endanger the safety of the
inmate, other inmates, staff and the community, result in severe
property damage, or effectuate an escape.

   g.  Restraints will be applied only for purposes outlined in
policy and in authorized methods.

   h.  Staff will be trained in confrontation avoidance, use of
force team technique, use of chemical agents, and application of
restraints.

   i.  Each use of force incident will be documented, reported,
and reviewed.

3. **DIRECTIVES AFFECTED**

   a. **Directive Rescinded**

   P5566.05   Use of Force and Application of Restraints on
              Inmates (12/31/96)

   b. **Directives Referenced**

   P1380.05   Special Investigative Supervisors Manual (8/1/95)
   P3420.09   Standards of Employee Conduct (2/5/99)
   P5214.04   HIV, Handling of Inmates Testing Positive (2/4/98)
   P5324.03   Suicide Prevention Program (5/3/95)
   P5500.11   Correctional Services Manual (10/10/03)
   P5500.12   Correctional Services Procedures Manual (10/10/03)
   P6031.01   Patient Care (1/15/05)
   P6190.03   Infectious Disease Management (6/28/05)

   c.  Rules cited in this Program Statement are contained in
28 CFR 552.20-27 and 29 CFR 1910.

4. **STANDARDS REFERENCED**

   a.  American Correctional Association 4th Edition Standards for
Adult Correctional Institutions: 4-4190, 4-4191, 4-4202,
4-4203, 4-4206, 4-4281**(M)**, and 4-4405

   b. American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities: 3-ALDF-3A-17, 3-ALDF-3A-17-1,
3-ALDF-3A-28, 3-ALDF-3A-29, 3-ALDF-3A-31, and 3-ALDF-4E-32

   c.  American Correctional Association 2nd Edition Standards for
the Administration of Correctional Agencies:  2-CO-3A-01

5.  [**TYPES OF FORCE** §552.21.]  Since inmates occasionally become
violent or display signs of imminent violence, it is sometimes
necessary for staff to use force and restraints to prevent them
from hurting themselves, staff, or others, and/or from destroying
property.

   [a.  **Immediate Use of Force**.  Staff may immediately use force
and/or apply restraints when the behavior described in §552.20
constitutes an immediate, serious threat to the inmate, staff,
others, property, or to institution security and good order.]

   Section 552.20 refers to Section 1 of this Program Statement.

P5566.06
11/30/2005
Page 4

In an immediate use of force situation, staff may respond with or without the presence or direction of a supervisor.

   [b.  <u>Calculated Use of Force and/or Application of Restraints</u>. This occurs in situations where an inmate is in an area that can be isolated (e.g., a locked cell, a range) and where there is no immediate, direct threat to the inmate or others.  When there is time for the calculated use of force or application of restraints, staff must first determine if the situation can be resolved without resorting to force (see §552.23).]

   Section 552.23 refers to Section 7 of this Program Statement.

   (1)  **Circumstances**.  Calculated rather than immediate use of force is desirable in all instances corrections workers encounter.  Although this is not always possible, staff must use common sense and good correctional judgment in each incident to determine whether the situation allows for the implementation of calculated or immediate use of force procedures.

   The safety of all persons is a major concern and Bureau of Prisons staff are required by laws, rules, and regulations, related to the Bureau of Prisons, to protect others from the hostile actions of inmates.  Immediate or unplanned use of force by staff is required when an inmate is trying to self-inflict injuries which may be life-threatening or is assaulting any other person to include other inmates.  The destruction of government property may require the immediate use of force by staff in some circumstances.  If the above circumstances are not present, staff should, if possible, employ the principles of calculated use of force.

   Calculated use of force is appropriate, for example, if the inmate is in a secure area or in an area where doors/grills may be secured, including cases when the inmate is making verbal threats or brandishing a weapon, provided staff believe there is no immediate danger of the inmate inflicting injury or harm to himself or herself or others.  Calculated use of force permits the use of other staff (e.g., psychologists, counselors, etc.) to attempt to resolve the situation non-confrontationally.

   (2)  **Documentation**.  The entire interaction must be documented in writing and placed in the FOI Exempt section of the inmate's central file.  The documentation will reflect the actions and responses of each staff member participating in the confrontation avoidance process.

P5566.06
11/30/2005
Page 5

The entire process must be videotaped, including the introduction of all staff participating in the confrontation avoidance process.  The tape and documentation will be part of the investigation package for the After Action Review (see Sections 14 and 15).  Additionally, the Warden must forward a copy of each video tape to the Regional Director within four working days of the incident.

**[c.  Use of Force Team Technique.  If use of force is determined to be necessary, and other means of gaining control of an inmate are deemed inappropriate or ineffective, then the Use of Force Team Technique shall be used to control the inmate and to apply to include ambulatory leg restraints.  The Use of Force Team Technique ordinarily involves trained staff, clothed in protective gear, who enter the inmate's area in tandem, each with a coordinated responsibility for helping achieve immediate control of the inmate.]**

See the Correctional Services Manual section on Use of Force Team Techniques.

**[d.  Exceptions.  Any exception to procedures outlined in this rule is prohibited, except where the facts and circumstances known to the staff member would warrant a person using sound correctional judgment to reasonably believe other action is necessary (as a last resort) to prevent serious physical injury, or serious property damage which would immediately endanger the safety of staff, inmates, or others.]**

The reviews are conducted to determine compliance with the provisions of this Program Statement.  As the team reviews the use of force incident, care should be taken in making a determination whether sound correctional judgement was used in any calculated or immediate use of force given the circumstances at the time of the incident.  The team's findings will be documented in writing.

The Warden or Acting Warden, Associate Warden (Correctional Services), Captain, and Health Services Administrator or designee will comprise the After-Action Review Team.  Each review must be conducted on the next work day following the incident (see Section 15).  A representative of the Council of Prison Locals at the appropriate level will be provided a copy of the After-Action report in accordance with appropriate laws, rules, and regulations.

The Warden must provide documentation to the Regional Director within two work days after the inmate has been released from

**000546**

P5566.06
11/30/2005
Page 6

restraints (if applicable). The report will confirm the review
was conducted and the use of force was either appropriate or
inappropriate. This requirement applies to all instances
involving the use of force, excluding the use of firearms (see
the Program Statements on the Correctional Services Manual and
the Correctional Services Procedures Manual for additional
information on Use of Force Team Techniques).

6.  [<u>PRINCIPLES GOVERNING THE USE OF FORCE AND APPLICATION OF
RESTRAINTS</u> §552.22

   a.  Staff ordinarily shall first attempt to gain the inmate's
voluntary cooperation before using force.]

   See Section 7 of this Program Statement for confrontation
avoidance procedures prior to any calculated use of force.

   [b.  Force may not be used to punish an inmate.

   c.  Staff shall use only that amount of force necessary to
gain control of the inmate. Situations when an appropriate
amount of force may be warranted include, but are not limited to:

      (1)  Defense or protection of self or others;

      (2)  Enforcement of institutional regulations; and

      (3)  The prevention of a crime or apprehension of one who
has committed a crime.

   d.  When immediate use of restraints is indicated, staff may
temporarily apply such restraints to an inmate to prevent that
inmate from hurting self, staff, or others, and/or to prevent
serious property damage. When the temporary application of
restraints is determined necessary, and after staff have gained
control of the inmate, the Warden or designee is to be notified
immediately for a decision on whether the use of restraints
should continue.]

   Restraints should be used only when other effective means of
control have failed or are impractical.

   Designee refers to the Acting Warden or Administrative Duty
Officer.

   [e.  Staff may apply restraints (for example, handcuffs) to the
inmate who continues to resist after staff achieve physical

000547

P5566.06
11/30/2005
Page 7

control of that inmate, and may apply restraints to any inmate
who is placed under control by the Use of Force Team Technique.
If an inmate in a forcible restraint situation refuses to move to
another area on his own, staff may physically move that inmate by
lifting and carrying the inmate to the appropriate destination.]

Staff are cautioned not to use the restraints for lifting or
carrying an inmate.

[f.  Restraints should remain on the inmate until self-control
is regained.

If the inmate was placed in restraints because of an assault on
staff, the assaulted employee must not be involved in deciding
whether the inmate has regained self-control.

g.  Except when the immediate use of restraints is required for
control of the inmate, staff may apply restraints to, or continue
the use of progressive restraints on, an inmate while in a cell
in administrative detention or disciplinary segregation only with
approval of the Warden or designee.

h.  Restraint equipment or devices (e.g., handcuffs) may not be
used in any of the following ways:

(1)  As a method of punishing an inmate;

(2)  About an inmate's neck or face, or in any manner which
restricts blood circulation or obstructs the inmate's airways;]

Tape shall not be placed around an inmate's mouth, nose, or
neck.  Staff protective equipment must be sufficient to insulate
staff from an inmate's spitting or biting, and conform with
29 CFR 1910.1030 and the Program Statement on Infectious Disease
Management.  Staff will not use any item or device (e.g., towels,
sheets, blankets, hosiery, masks) in use of force situations.

[(3)  In a manner that causes unnecessary physical pain or
extreme discomfort;]

In general, when applying restraints, staff will use sound
correctional judgement to ensure unnecessary pressure is not
applied to the inmate.

Although the proper application of restraints may result in
some discomfort, prohibited uses of restraints include, but aer
not limited to: "hogtying", unnecessarily tightness, or

P5566.06
11/30/2005
Page 8

improperly applied restraints.  All inmates placed in restraints should be closely monitored.

When it is necessary to use continued restraints after any use of force incident, hard restraints (i.e., steel handcuffs and leg irons) are to be used only after soft restraints have proven ineffective, or a past history of ineffectiveness exists.

**[(4)   To secure an inmate to a fixed object, such as a cell door or cell grill, except as provided in §552.24.]**

Section 552.24 refers to Section 10 of this Program Statement.

**[i.   Medication may not be used as a restraint solely for security purposes.**

**j.   All incidents involving the use of force and the application of restraints (as specified in § 552.27) must be carefully documented.]**

Section 552.27 refers to Section 14 of this Program Statement. This documentation includes, whenever practicable, filming the incident and a formal review by the institution's After-Action Review Committee.  Reports and videotapes of the incident must be reviewed, audited, and monitored by Regional and Central Office.

All use of force incidents must be reported and investigated to protect staff from unfounded allegations and eliminate the unwarranted use of force.

**7.   [CONFRONTATION AVOIDANCE PROCEDURES §552.23.  Prior to any calculated use of force, the ranking custodial official (ordinarily the Captain or shift Lieutenant), a designated mental health professional, and others shall confer and gather pertinent information about the inmate and the immediate situation.  Based on their assessment of that information, they shall identify a staff member(s) to attempt to obtain the inmate's voluntary cooperation and, using the knowledge they have gained about the inmate and the incident, determine if use of force is necessary.]**

Ordinarily, in calculated use of force situations, there is time for the Captain or Shift Lieutenant, Mental Health professional, Health Services staff, Chaplain, or other staff such as the inmate's Unit Manager, Case Manager, or Counselor, to confer and assess the situation.

**000549**

P5566.06
11/30/2005
Page 9

This discussion may be accomplished by telephone or in person. The purpose is to gather relevant information concerning the inmate's medical/mental history (e.g., hypoglycemia, diabetes, etc.), any recent incident reports or situations which may contribute to the inmate's present condition (e.g., pending criminal prosecution or sentencing, recent death of a loved one, divorce, etc.).

This assessment should include discussions with staff who are familiar with the inmate's background or present status.  This information may provide insight into the cause of the inmate's immediate agitation.

Additionally, it may identify other staff who may have a rapport with the inmate, and can possibly resolve the incident peacefully without the use of force.

8.  **USE OF FORCE SAFEGUARDS.**   To prevent injury and exposure to communicable disease in calculated use of force situations, the following must occur.

   a.  Staff participating in any calculated use of force, including those participating in the Use of Force Team technique, must:

      (1)  Wear appropriate protective gear in accordance with the circumstances.  A list of protective gear to be used, depending upon the circumstances, may be found in 29 CFR 1910 and the Program Statements on Correctional Services Manual and Infectious Disease Management.

      (2) Personnel with documented injuries or diseases have an obligation to inform management that they are unable to participate in calculated use of force situations.  Staff members will also be asked during their introduction on camera if they are willing to participate in this action and have no injuries or diseases that would prohibit their participation.  The agency will comply with the hepatitis B vaccination procedures as outlined in 29 CFR 1910.1030.

   b.  Personnel with a skin disease or skin injury shall not be permitted to participate in a calculated use of force action.

   c.  Recognizing that a rapid response is imperative in an immediate use of force situation, responding staff must use sound correctional judgment in determining if time is available to obtain readily available protective equipment when responding (shields, helmets with face shields, pads, jumpsuits, etc.).  Often, circumstances will not permit the time to carry this out.

P5566.06
11/30/2005
Page 10

If an emergency situation results in a use of force, precautions, such as protective clothing and equipment, impede the transmission of infectious diseases.

d.   Staff members will treat every calculated use of force as if blood and bodily fluids are present.   Sufficient protective equipment and clothing must be available for all staff participating in a calculated use of force.   Employees must report any exposure to bodily fluids, or other contagious diseases, that occur during the course of their duties.

Employees must report these exposures via the injury assessment form or through other written methods to the Health Services Department, as soon as practicable, and appropriate OWCP form(s). The employee should also immediately inform his or her supervisor.

If it is possible that an inmate could have transmitted a disease such as human immunodeficiency virus (HIV), the exposed employee may request the inmate to be tested promptly.   The employer recognizes this is an extremely important concern, and due diligence will be exercised testing the inmate and processing the test.   The employer will notify the employee of the test results immediately upon receipt in accordance with the Correctional Officers Health & Safety Act of 1998.

(1)   After all use of force incidents, areas where there is spillage of blood, or other body fluids, must be sanitized immediately upon the authorization of the Special Investigative Supervisor (SIS) or Shift Supervisor, who must first determine whether there is a need to preserve evidence.   Procedures for the cleaning of blood spillage or bodily fluids must be made available to staff responsible for such cleaning.

(2)   All blood and body secretions will be removed immediately in the appropriate waste disposal container.   The area must be washed with an antiseptic solution, pursuant to the Program Statements on Procedures for Handling of HIV Positive Inmates Who Pose a Danger to Others and Infectious Disease Management.

(3)   Sanitation measures, in compliance with 29 CFR 1910 and Safety directives (i.e., local exposure control plan) must be implemented following use of force incidents where there is a possibility of exposure to bodily fluids or potentially infectious materials.   Such measures may not take place until the scene has been released from the investigatory process.   Any clothing, including staff's or inmate's clothing, as well as

P5566.06
11/30/2005
Page 11

personal protective equipment which has been exposed to blood borne pathogens or other potentially infectious diseases must be disinfected or destroyed immediately.

9. **PROGRESSIVE AND AMBULATORY RESTRAINTS**. For this PS's purposes, progressive restraints are defined as the process of using the least restrictive restraint method to control the inmate as deemed necessary for the situation. Based on the inmate's behavior, more restrictive and secure restraints may be used.

Ambulatory restraints are defined as approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention.

The policies and procedures described in Sections 10 and 13 of this Program Statement will be followed for inmates placed in restraints under this section (ambulatory restraints) including:

- conditions of confinement,
- scheduled checks,
- documentation, and
- 24 and 48 hour reviews by the Warden and staff.

Ambulatory restraints should initially be used to restrain an inmate if deemed appropriate for the situation. An example of such situations is when an assaultive incident occurred quickly and ended, and the inmate is no longer displaying signs of violence or aggressiveness. Using ambulatory restraints for a period of time may be appropriate for protecting staff and others, pending an assessment by staff to determine whether the inmate has regained self-control.

Staff should look for a pattern of non-disruptive behavior over a period of time as an indication the inmate has regained self-control and is no longer a disruptive threat. Additionally, the 15 minute and two-hour logs should be reviewed to support any decision concerning the release of an inmate in restraints. Inmates asleep at the time of two-hour review will be awakened to assess their condition.

If the situation dictates the need for more restrictive or secure restraints, i.e., the inmate's behavior becomes increasingly aggressive and disruptive, staff must determine the type of progressive restraints to be used (hard restraints with or without waist chain or waist belt, four-point soft restraints with hard restraints used for securing the inmate to the bed, or four-point hard restraints).

P5566.06
11/30/2005
Page 12

In situations involving highly assaultive and aggressive inmates, progressive restraints should be used only as an intermediate measure in placing the inmate in or removing an inmate from four-point restraints.

When it is necessary to restrain an inmate under this section (ambulatory restraints) for longer than eight hours, the Regional Director or Regional Duty Officer must be notified telephonically by the Warden or designee or the Institution Administrative Duty Officer.

10.   [USE OF FOUR-POINT RESTRAINTS §552.24.   When the Warden determines that four-point restraints are the only means available to obtain and maintain control over an inmate, the following procedures must be followed:

   a.  Soft restraints (e.g., vinyl) must be used to restrain an inmate, unless:

      (1)  Such restraints previously have proven ineffective with respect to that inmate, or

      (2)  Such restraints are proven ineffective during the initial application procedure.]

   This may not be delegated below the Warden's level.

   [b.  Inmates will be dressed in clothing appropriate to the temperature.

   c.  Beds will be covered with a mattress, and a blanket/sheet will be provided to the inmate.]

   Under no circumstance shall an inmate be allowed to remain naked or without bed covering placed over the inmate's body unless determined necessary by qualified health personnel.

   [d.  Staff shall check the inmate at least every fifteen minutes, both to ensure that the restraints are not hampering circulation and for the general welfare of the inmate.  When an inmate is restrained to a bed, staff shall periodically rotate the inmate's position to avoid soreness or stiffness.]

   Qualified health personnel shall evaluate the inmate to be restrained to a bed to determine the position the inmate should be placed in.  When qualified health personnel are not immediately available, the inmate shall be placed in a "face-up"

P5566.06
11/30/2005
Page 13

position until evaluated by qualified health personnel.  Inmates must be checked every 15 minutes and this information shall be documented.

Inmates will be checked every 15 minutes and this information must be documented.  See Section 14.b., **Use of Restraints Reporting Requirements** for detailed information on documenting 15 minute checks.

**[e.  A review of the inmate's placement in four-point restraints shall be made by a Lieutenant every two hours to determine if the use of restraints has had the required calming effect and so that the inmate may be released from these restraints (completely or to lesser restraints) as soon as possible.  At every two-hour review, the inmate will be afforded the opportunity to use the toilet, unless the inmate is continuing to actively resist or becomes violent while being released from the restraints for this purpose.]**

Based on the particular nature of the situation, the Lieutenant who has offered the inmate a bathroom break will determine how many staff are needed to release the inmate from restraints and provide the inmate a bathroom break.  The Lieutenant will assemble the staff and visually observe and direct staff as they complete this task.  The Lieutenant will determine what protective equipment is needed, if any, for the staff assisting with the inmates bathroom break.

The goal of the two-hour reviews is to determine, as soon as possible, that the inmate has regained self-control and may be placed in lesser restraints.  See Section 9, **Progressive and Ambulatory Restraints**.  Staff should look for a pattern of non-disruptive behavior over a period of time indicating the inmate has regained self-control and is no longer a disruptive threat. Additionally, the 15 minute and two-hour check logs must be reviewed to support any decision for lesser measures or the removal of restraints.  Inmates asleep at the time of the two-hour reviews should be awakened to assess their condition.

If an inmate is released temporarily from four-point restraints for any reason, e.g., to use the toilet, consumption of food or beverage, etc., without continuing disruptive or aggressive behavior, the Lieutenant must consider authorizing lesser restraints or removing the restraints.  See Section 9, **Progressive and Ambulatory Restraints**.  If an inmate is returned to four-point restraints after a non-disruptive break, the Lieutenant, must document the reasons for the action.

P5566.06
11/30/2005
Page 14

Ordinarily, the Operations Lieutenant makes the decision to release an inmate or apply lesser restraints.  This authority must not be delegated below the Lieutenant level.  If the Lieutenant needs to consult with mental health staff before making the decision on whether to release an inmate from restraints, it will be sought without delay.

[f.  **When the inmate is placed in four-point restraints, qualified health personnel shall initially assess the inmate to ensure appropriate breathing and response (physical or verbal).  Staff shall also ensure that the restraints have not restricted or impaired the inmate's circulation.  When inmates are so restrained, qualified health personnel ordinarily are to visit the inmate at least twice during each eight-hour shift.  Use of four-point restraints beyond eight hours requires the supervision of qualified health personnel.  Mental health and qualified health personnel may be asked for advice regarding the appropriate time for removal of the restraints.**]

Health Services staff, perform initial and subsequent required checks, must examine and document the following:

- Date and time of examination;
- Examining staff member;
- Body position;
- Restraints (adequate circulation);
- Vital signs (blood pressure, pulse, respiration, and temperature);
- Medication;
- Injuries;
- The inmate's intake, output, hydration, etc.;
- Possible medical reasons for behavior;
- Deterioration of inmate's health; and
- Any other significant findings and comments.

In institutions without 24-hour medical coverage, medical staff must report to the institution twice during each eight-hour shift that an inmate remains in four-point restraints.  Such staff will be compensated (overtime, compensatory hire, etc.) in accordance with the regulations.  Under no circumstances will non-medical staff perform a medical assessment of an inmate.

Psychology Services staff will examine inmates in four-point restraints at least once during every 24 hour period that the inmate is restrained.  Psychology staff examinations will include the following:

(1)  A review of the inmate's psychological history;

**000555**

(2) A description of the interview conducted with the inmate;

(3) A review of the 15 minute, two-hour, and health services review logs;

(4) A description of the inmate's current mental health status;

(5) Recommendations; and

(6) Whether the inmate is being referred for mental health institution placement and an explanation.

See Section 14.b., **Use of Restraints Reporting Requirements**, for detailed information on documenting Health and Psychology Services Staff reviews.

**[g.  When it is necessary to restrain an inmate for longer than eight hours, the Warden (or designee) or institution administrative duty officer shall notify the Regional Director or Regional Duty Officer by telephone.]**

The above notification will be made for each consecutive eight-hour period the inmate remains in restraints.  Documentation detailing the reasons for the placement of each inmate in four-point restraints, regardless of the duration, must be provided to the Regional Director or Regional Duty Officer on the following work day.

Additionally, within 24 hours of placement in restraints, a review of the inmate's status will be conducted and a behavior management plan prepared.  The Warden, Associate Warden, Captain, Unit Manager, Health Services Administrator, and Chief Psychologist will conduct this review.  All relevant information will be reviewed, including the 15-minute, Lieutenant, medical staff, and psychology service checks logs.

Evidence indicating the inmate's inability to be placed in lesser restraints or released from restraints must support the Warden's decision to continue restraints beyond the initial 24 hour period.  In making this decision, the Warden should look for a pattern of non-disruptive behavior over a period time indicating the inmate has regained self-control and is no longer a disruptive threat.

Additionally, the Warden's documentation must indicate specifically what considerations are being made for mental health treatment, including possible referral to a mental health institution.

000556

P5566.06
11/30/2005
Page 16

The Warden's review should be documented in memorandum format to the file, with a copy faxed to the Regional Director immediately upon completion. The memorandum should summarize the reports of each participant, followed by the Warden's decision and justification. Group reviews of this type must be conducted within every 48-hour period following the initial 24-hour review. See Section 14.b., Use of Restraints Reporting Requirements, for detailed information on documenting the initial 24-hour, and subsequent 48-hour, reviews.

11. [USE OF CHEMICAL AGENTS OR NON-LETHAL WEAPONS §552.25. **The Warden may authorize the use of chemical agents or non-lethal weapons only when the situation is such that the inmate:**

   a. **Is armed and/or barricaded; or,**

   b. **Cannot be approached without danger to self or others; and,**

   c. **It is determined that a delay in bringing the situation under control would constitute a serious hazard to the inmate or others, or would result in a major disturbance or serious property damage.]**

Qualified health personnel (Physician, Physician's Assistant, or nurse) shall be consulted prior to staff using chemical agents unless the circumstances require an immediate response. Ordinarily, in a calculated use of force situation, the inmate's medical file must be reviewed by these personnel to determine whether the inmate has any diseases or conditions which would be dangerously affected if chemical agents or non-lethal weapons are used. This includes, but is not limited to: asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure. Local procedures will be developed where 24 hour medical coverage is unavailable.

12. [MEDICAL ATTENTION IN USE OF FORCE AND APPLICATION OF RESTRAINTS INCIDENTS §552.26

   a. **In immediate use of force situations, staff shall seek the assistance of mental health or qualified health personnel upon gaining physical control of the inmate. When possible, staff shall seek such assistance at the onset of the violent behavior. In calculated use of force situations, the use of force team leader shall seek the guidance of qualified health personnel(based on a review of the inmate's medical record) to identify physical or mental problems. When mental health staff**

000557

or qualified health personnel determine that an inmate requires
continuing care, and particularly when the inmate to be
restrained is pregnant, the deciding staff shall assume
responsibility for the inmate's care, to include possible
admission to the institution hospital, or, in the case of a
pregnant inmate, restraining her in other than face down
four-point restraints.

   b.  **After any use of force or forcible application of
restraints, the inmate shall be examined by qualified health
personnel, and any injuries noted, immediately treated.]**

   If any staff involved in a use of force reports an injury,
Health Services personnel should provide an immediate examination
and initial emergency treatment as required.  Staff may also seek
treatment from their personal physician.

13.  **USE OF FORCE IN SPECIAL CIRCUMSTANCES.**  In certain
extenuating circumstances, and after confrontation avoidance has
failed or has proven to be impractical, staff may be forced to
make a decision, such as whether to use force on a pregnant
inmate or an aggressive inmate with open cuts, sores, or lesions.

Special cases such as mentally ill, disabled, or pregnant
inmates, after consultation with the Clinical Director, must be
assessed carefully to determine whether the situation is grave
enough to require the use of physical force.

   a.  **Pregnant Inmates.**  When pregnant inmates have to be
restrained, necessary precautions must be taken to ensure the
fetus is unharmed.  Health Services personnel must prescribe the
necessary precautions, including decisions about the manner in
which the inmate is to be restrained, i.e., whether medical
personnel should be present during the application of restraints,
whether the inmate should be restrained at the institutional
hospital or a local medical facility, etc.

   b.  **Inmates with Wounds or Cuts.**  Aggressive inmates with open
cuts or wounds who have attempted to harm themselves or others
should be carefully approached by staff in the prescribed
protective clothing/gear.  A full body shield should also be used
during these encounters to protect staff.  Aggressive inmates,
after placement in restraints, should be placed in administrative
detention and separated from other inmates.

P5566.06
11/30/2005
Page 18

Ordinarily, inmates of this status must remain in
administrative detention until cleared to return to the general
population by the Captain, Chief Psychologist, and the Clinical
Director with the Warden's approval.

14.  [**DOCUMENTATION OF USE OF FORCE AND APPLICATION OF RESTRAINTS
INCIDENTS** §552.27.  **Staff shall appropriately document all
incidents involving the use of force, chemical agents, or
non-lethal weapons.  Staff shall also document, in writing, the
use of restraints on an inmate who becomes violent or displays
signs of imminent violence.  A copy of the report shall be placed
in the inmate's central file.**]

    a.  **Report of Incident.**  A Use of Force Report (BP-E583) will
be prepared on the use of force, chemical agents/pepper mace,
progressive restraints, and non-lethal weapons.  This reporting
requirement includes the application of progressive restraints on
an inmate who complies with the placement of the restraints.

    The report must establish the identity of all involved in the
incident; inmates, staff, and others.  It must provide a vivid,
detailed description of the incident.  The report, including
mental health/medical reports must be submitted to the Warden or
designee no later than the end of the tour of duty.  A copy of
the report is to be placed in the inmate's central file.  Copies
are also to be sent within two work days to:

        (1)  Assistant Director, Correctional Programs Division;
        (2)  Assistant Director, Health Services Division;
        (3)  Central Office Correctional Services Administrator;
        (4)  Regional Director; and,
        (5)  Regional Correctional Services Administrator.


    A report is not necessary for the general use of restraints
(for example, the routine movement or transfer of inmates).

    b.  **Use of Restraints Reporting Requirements**

        **Documented Reviews.**  The following reviews will be
documented as indicated:

        (a) Fifteen-minute check – **fifteen-Minute Restraints
Check Form (24 Hours)** (BP-S0717.055);

        (b) Two-hour Lieutenant check – **Two-Hour Lieutenant
Restraints Check Form (24 Hours)** (BP-S0718.055);

P5566.06
11/30/2005
Page 19

(c) Health Services Staff Review  - **Health Services Restraint Review Form (24 Hours)** (BP-S0719.055); and

(d) Psychology Staff Check  - **Psychology Services Restraint Review Form (24 Hours)** (BP-S0720.055).

Staff must complete all forms until the inmate is released from restraints.  The forms will be submitted to the Warden as required for periodic reviews of an inmate's placement in restraints.  After release from restraints, these forms must be compiled and maintained in the Inmate's Central File and Special Investigative Supervisor's file.

c.  **Videotape of Use of Force Incidents**.  Staff must obtain a video camera immediately and record any use of force incident, unless it is determined that a delay in resolving the situation would endanger the inmate, staff, or others, or would result in a major disturbance or serious property damage.

The video recording will also include any medical examination conducted after:

- the application of restraints,
- use of chemical agents,
- use of pepper mace, and/or
- use of non-lethal weapons.

Calculated use of force shall be videotaped following the sequential guidelines presented in the Correctional Services Manual.  The original videotape must be maintained and secured as evidence in the SIS Office.  A copy of every videotape, after review by the Warden (within four work days of the incident), unless requested sooner by the Regional Director, will be provided immediately to the Regional Director for review.

The Regional Director shall forward videotapes of questionable or inappropriate cases immediately to the Assistant Director, Correctional Programs Division, Central Office, for review.

When a threat to the safety of the inmate, staff or others, or property, requires an immediate response, staff are obligated to obtain a camera and begin recording the event as soon as feasible.  As soon as control of the situation has been obtained staff must record information on:

- injuries;

**000560**

P5566.06
11/30/2005
Page 20

- circumstances that required the need for immediate use of force; and
- identifications of the inmates, staff, and others involved.

d. **Documentation Maintenance**.  The Captain must maintain all documentation, including the videotape and the original BP-E583, for a minimum of 2½ years.  A separate file must be established on each use of force incident.

15.  **AFTER-ACTION REVIEW OF USE OF FORCE AND APPLICATION OF RESTRAINTS INCIDENTS**.  Following any incident involving the use of force (calculated or immediate) and the application of restraints, the Warden, Associate Warden (responsible for Correctional Services), Health Services Administrator, and Captain must meet and review the incident.  The review is conducted to assess the rationale of the actions taken (e.g., if the force was appropriate and in proportion to the inmate's actions).

The review team should gather relevant information to determine if policy was adhered, and complete the standard After-Action Report (BP-E586), indicating the nature of the review and findings.  The BP-E586 should be submitted within two working days after the inmate is released from restraints.

a. **Videotape Review**.  The After-Action Review Team should review the actions of the staff for compliance with the Correctional Services Manual and this policy.  At a minimum, this review should include the following:

- The Lieutenant displayed professional behavior during the Forced Cell Team technique.

- The Lieutenant ensured only the force necessary to control the inmate is used, based on the nature of the incident.

- The Lieutenant monitored the actions of the inmate and team members; and was not involved in subduing the inmate unless it is deemed necessary to prevent staff or inmate injury.

- The Use of Force Team members were wearing the proper protective gear.

- Unauthorized items such as towels, tape, surgical mask, hosiery, etc., was not being used.

- Introductions were made by the Lieutenant, Use if Force Team members, medical staff, and staff involved in the confrontation avoidance technique as well as identifying all staff present, including those observing.

- Use of Force Team members used sound correctional judgment to ensure unnecessary pressure is not applied to the inmate.

- Use of Force Team members used only the amount of force necessary to gain control of the inmate.

- Inabilities to effectively gain control of the inmate are assessed and may indicate that additional training is necessary.

- There was continuous operation of the video and breaks were documented and appropriately justified.

- Prompt examination of the inmate followed the move and findings were noted on the video tape.

- The method of chemical agents used was predetermined and use of devices was in accordance with the Correctional Services Manual.

- The inmate was given the opportunity to voluntarily submit to the placement of restraints.

- Conversations were appropriate and necessary between team members and individuals during the use of force.

b. **Report Completion**. When this review is completed, an After-Action Review Report (BP-E586) must be completed, as soon as possible, not later than two working days after the inmate has been removed from restraints. This will ensure that staff with relevant information will be available and any necessary medical follow-up can be immediately provided to ascertain the nature of any injuries involved.

The Warden or designee will attest by his or her signature that the review was conducted and the use of force was appropriate or inappropriate.

c. **Further Investigation**. The reviewers should also decide if the matter requires further investigation. If deemed appropriate, the Warden will refer the matter for further investigation to the Office of Inspector General, Office of

P5566.06
11/30/2005
Page 22

Internal Affairs, or Federal Bureau of Investigation.  Copies of
the report must be forwarded to the Regional Director and
Assistant Director, Correctional Programs Division, Central
Office.

   d.  **Report on Restraints Use**.  A report is not necessary for
the general use of restraints.  For example, a report is not
required in the routine movement or transfer of inmates.

16.  **TRAINING IN THE CONFRONTATION AVOIDANCE/USE OF FORCE
TECHNIQUE**.  In order to control any potential situation involving
aggressive inmates, all staff must be made aware of their
responsibilities through ongoing training.  At a minimum,
training must cover:

   ■  communication techniques,
   ■  cultural diversity,
   ■  dealing with the mentally ill,
   ■  confrontation avoidance procedures,
   ■  the application of restraints (progressive and hard), and
   ■  reporting procedures.

   a.  **Training Topics**.  The Warden of each institution shall
determine how many staff should be trained in confrontation
avoidance procedures and forced cell move techniques.  At a
minimum, these staff shall be trained on an annual basis.  Each
staff member participating in a calculated forced cell move must
have documented proof of annual training in these areas.
Training should also include specific information pertaining to
special situations.

   b.  **Restraints Training**.  Staff should be trained thoroughly in
the use of both soft and hard restraints on an annual basis.  The
application of soft restraints to an inmate can be cumbersome if
proper training is not provided.

   Soft restraints such as vinyl or leather should be used prior
to applying hard restraints.  For pregnant inmates, the approved
vinyl or leather restraint belt should be used instead of a metal
waist chain, whenever possible, to prevent injury to the inmate
or fetus.

                         /s/
                    Harley G. Lappin
                    Director

**Name: Landor, Damon**
**Reg. Number: 28711-034**

## RESPONSE

The no flesh alternative on the National Menu for the chili dog meal that you reference is vegetable chili. You were provided what is listed on the National Menu. I have spoken with the Food Service Administrator and he assures me that the no flesh participants are receiving what is listed on the National Menu. Additionally, participants of the no flesh option of the National Menu receive peanut butter whenever soy is served. The no flesh participants are scheduled to receive a soy burger, cottage cheese, and peanut butter for the lunch meal on the 4th of July, along with macaroni salad, potato salad, baked beans, corn, bread, watermelon, margarine, and a beverage packet.

Additionally, you state that the pastries you have been receiving are not the proper portion size. The Food Administrator states that all pastries meet the minimum requirements.

7-6-2012
_____
Date

_____
Krista Bahre, AW(O)

UNITED STATES DISTRICT COURT

FOR THE

MIDDLE DISTRICT OF PENNSYLVANIA

NO 1:11-CV-759

DAMON LANDOR                                                    PLAINTIFF

V.

JAMES HEPNER                                                    DEFENDANT

---

## NOTICE

---

COME NOW PLAINTIFF LANDOR PROCEEDING PRO'SE AND GIVE NOTICE
THAT HE AMEND COMPLAINT PURSUANT RULE 15(A) AND 19(A).
LANDOR IS TRYING TO SECURE A AFFIDAVIT FROM MUHAMMAD DYE WHOM
IS AT USP LEWISBURG. LANDOR WILL SUBMIT THE AFFIDAVIT ONCE IT'S
HAS BEEN SECURED.

RESPECTFULLY SUBMITTED

DAMON LANDOR
USP LEWISBURG
PO BOX 1000
LEWISBURG PA 17837

DATED AUGUST 19 2012



Inmate Name: DAMON LAUDOR
Register Number: 28711 034
United States Penitentiary
P.O. Box 1000
Lewisburg, PA 17837

RECEIVED
SCRANTON

AUG 24 2012

PER _____
DEPUTY CLERK

M.P.
8/19/12

LEGAL MAIL   LEGAL MAIL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
WILLIAM J NEALON FEDERAL BLDG
235 NORTH WASHINGTON AVE
PO BOX 1148
SCRANTON PA 16501-1148

OFFICIAL BUSINESS